IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IN RE CONSTELLATION ENERGY GROUP, INC. ERISA LITIGATION | : : : : : : : : | Civil Action No. CCB-08-2662 |

...o0o...

# MEMORANDUM

Now pending before the court is a motion to dismiss filed by defendants Constellation Energy Group, Inc. ("Constellation"); Nine Mile Point Nuclear Station, LLC ("Nine Mile"); and Mayo A. Shattuck III, Marcia B. Behlert, Charles A. Berardesco, Thomas F. Brady, Thomas V. Brooks, John R. Collins, Kenneth W. DeFontes, Jr., Beth S. Perlman, Jonathan W. Thayer, Marc L. Ugol, and Michael J. Wallace (collectively "individual defendants"). Plaintiffs Joseph R. Lang, Gracie Cash, Ronald W. Hays, Edmund Chrzanowski, Kelly DeGroot, Stephen T. Metcalf, and Harold Phipps (collectively "plaintiffs") have brought a consolidated class action, alleging that the fiduciaries of the Constellation Energy Group, Inc. Employee Savings Plan (the "Constellation Savings Plan") and the Represented Employee Savings Plan for Nine Mile Point (the "Nine Mile Savings Plan") (collectively the "Plans"), breached their fiduciary duties under ERISA by maintaining the Plans' significant investment in Constellation stock from January 30, 2008 to the present (the "Class Period") when they knew or should have known that investment in Constellation stock was imprudent and by providing materially misleading information to Plan participants. The issues in this motion have been fully briefed and the court heard oral argument on June 17, 2010. For the reasons stated below, defendants' motion will be granted.

**BACKGROUND**

Constellation is an energy company located in Baltimore, Maryland, that provides power to Maryland customers through its regulated utility, Baltimore Gas and Electric Company, and to nationwide customers through subsidiaries. Constellation is a public company, with stock traded on the New York Stock Exchange under the symbol "CEG." Nine Mile operates a nuclear power plant in Scriba, New York and is a wholly owned subsidiary of Constellation. The plaintiffs are all former employees of Constellation or Nine Mile who are participants in either the Constellation or Nine Mile Plans. Each plaintiff owned Constellation stock in his or her individual Plan account during the Class Period.

The Plans are employee pension benefits plans as defined by ERISA, 29 U.S.C § 1002(2)(A), and are designed in part to help participants save for retirement. (*See* Compl. ¶¶ 33 & 48.)[1] Both Plans offer various retirement savings options for employees, including the CEG Common Stock Fund, comprised of Constellation stock. Under the Constellation Plan, employer matching contributions must be allocated to the CEG Common Stock Fund (*See id.* ¶ 42.) The Nine Mile Plan does not require such placement, but employee matching contributions are routinely placed in the CEG Common Stock Fund as well. (*See id.* at ¶ 55.)

In 2001, Constellation began to increase its merchant energy business, through which it traded energy in unregulated energy markets. Although highly profitable at first, Constellation's merchant energy business carried great risk. Energy trading required Constellation to post

---

[1] Only the Nine Mile Plan explicitly mentions retirement savings in the Plan itself. (*See* Def.'s Mot. to Dismiss Ex. I at Preamble ("This Plan is established ... for the exclusive benefit of Eligible Employees ... and their Beneficiaries in order to provide additional retirement security through a deferred savings and investment program").) The Constellation Plan describes itself as a "stock bonus plan" through which employees "have the opportunity to save on a regular or long-term basis, and in the process acquire or sustain a proprietary interest in the success of Company." (Def.'s Mot. to Dismiss Ex. H at § 1.1.)

considerable cash collateral, which would increase if Constellation's credit rating dropped. In addition, Constellation was exposed to the credit risks of its trading partners who could fail to perform their end of a contract at any point. By 2007, merchant energy trading constituted approximately 84 percent of the company's net income. (*See id.* at ¶ 102.)

In 2005, Constellation considered merging with FPL Group, a regulated utility energy company, in an effort to diversify its business, improve its credit rating, and lower its risk. In June 2006, however, Constellation abandoned the planned merger and continued to rely on its energy trading business for a large share of its profits. While Constellation acknowledged the risks of energy trading in its 2007 Annual Report, it assured investors that it had established policies and procedures in place to manage the risk. (*See id.* at ¶ 125.) In addition, the 2007 Annual Report stated that Constellation's earnings had increased by 27 percent per share from 2006 to 2007 and that continued earnings growth was expected throughout 2008 and 2009. (*See id.* at ¶¶ 127-128.) Specifically, Constellation estimated that shares would earn $5.25 to $5.75 each in 2008 and that it expected earnings would be in the middle to upper end of that range. (*See id.* at ¶ 128.)

Constellation stock closed at $92.40 on January 30, 2008. (*See id.* at ¶ 132.) On April 30, 2008, Constellation, in its Form 8-K, announced adjusted earnings of $0.95 per share in the first quarter of 2008. (*See id.* at ¶ 133.) Although this was eight percent lower than the $1.03 adjusted earnings per share earned in the first quarter of 2007, Constellation reaffirmed its previous estimate of earnings for the year reaching $5.25 to $5.75 per share. (*See id.*) On July 30, 2008, Constellation released its Form 8-K announcing that earnings for the second quarter of 2008 had exceeded expectations. (*See id.* at ¶ 137.) Constellation's stock, which had traded at about $78 per share at the end of June, closed at $83.16 per share following the company's July 30 announcement. (*See id.* at ¶¶ 136 & 138.)

On August 11, 2008, Constellation released its Form 10-Q for the quarterly period ending June 30, 2008. In this report, Constellation acknowledged that it had incorrectly calculated its cumulative obligations in the event of credit rating downgrades in its Form 10-Q for the quarterly period ending March 31, 2008. (*See* Def.'s Mot to Dismiss Ex. A-5.) While the previous 10-Q had stated that the cumulative obligations were $320 million for a one-level downgrade, $626 million for a two-level downgrade, and $1,608 million for a three-level downgrade, the correct figures were $129 million, $844 million, and $3,234 million respectively. (*See id.*) Thus, the incorrect calculation had overestimated the amount of collateral needed in the event of a one-level downgrade, while underestimating the amount of collateral needed in the event of a two or three-level downgrade. Constellation also announced in the August 11 Form 10-Q that as of July 31, 2008, the cumulative obligations were estimated to be $106 million for a one-level downgrade, $681 million for a two-level downgrade, and $3,365 million for a three-level downgrade. (*See id.*)

The plaintiffs do not state when Constellation first learned of the calculation error, but they do not contest the defendants' assertion that the error was discovered in late July. In reaction to the August 11, 2008 announcement, Constellation's share price dropped by 16 percent. (*See* Compl. ¶ 149.) On August 13, 2008, Standard & Poor's lowered Constellation's credit rating by one level, citing the accounting discrepancy, the company's increasing risk profile, and the possibility of Constellation's credit rating being downgraded to below investment grade. (*See id.* at ¶ 150.) Soon after, Fitch Ratings followed suit. By the end of August 2008, Constellation's stock was valued at $66 per share. (*See id.* at ¶ 157.)

On September 15, 2008, the public learned that Lehman Brothers had filed for bankruptcy and Constellation's share price fell to $47.99. (*See id.* at ¶ 163.) The share price closed at $30.76 on September 16 and at $24.77 on September 17, 2008. (*See id.* at ¶¶ 163 & 170.) On September 19,

2008, Constellation announced a merger agreement with MidAmerican Energy Holdings Co. ("MidAmerican"), which had agreed to purchase all outstanding shares for $26.50 per share. (*See id.* ¶ 175.) In addition, Constellation announced that it would prioritize risk reduction over short-term profits and began to sell off assets and internally reorganize to reduce risk exposure and avoid further credit rating downgrades. (*See id.* at ¶¶ 178, 183-188.) On December 17, 2008, Constellation and MidAmerican called off their merger agreement and Constellation instead entered into an agreement with Électricité de France International ("EDF") whereby Constellation would sell preferred stock and certain assets to EDF in exchange for additional liquidity. (*See id.* at ¶¶ 192-93.) Nevertheless, Constellation continued to suffer large losses in the fourth quarter of 2008. (*See id.* at ¶ 189.)

The defendants are divided into several groups. The "Prudence Defendants" are the Investment Committee, the individual members of the Investment Committee,[2] Nine Mile, and Marcia B. Behlert, Director-Benefits of Constellation and Plan Administrator during the Class Period. The "Monitoring Defendants" are Constellation and Mr. Shattuck.[3] The "Conflict of Interest Defendants" include all defendants.

The plaintiffs claim that the Prudence Defendants breached their duty of prudence by continuing to offer Constellation stock as a retirement savings option and that they breached their duty of loyalty by communicating material misrepresentations about the financial health of Constellation to Plan participants (Count I). The Monitoring Defendants are accused of breaching their duty to monitor their fiduciary appointments (Count II). The plaintiffs allege that the Conflict

---

[2] The individual members of the Investment Committee are: Charles A. Berardesco, Thomas F. Brady, Thomas V. Brooks, John R. Collins, Kenneth W. DeFontes, Jr., Beth S. Perlman, Mayo A. Shattuck III, Jonathan W. Thayer, Marc L. Ugol, and Michael J. Wallace.

[3] Mr. Shattuck served as Constellation's Executive Chairman, CEO, President, Chairman of the Executive Committee of the Board, and Chairman of Baltimore Gas and Electric Company's Board of Directors during the Class Period.

of Interest Defendants breached their duty to avoid conflicts of interest by failing to timely engage independent fiduciaries (Count III). The plaintiffs also allege that all of the defendants breached their co-fiduciary duties (Count IV) and that, if Constellation is not found to be a fiduciary, it is liable in equity for knowingly participating in a fiduciary breach (Count V).

## ANALYSIS

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

6

misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

I. Duty of Prudence

The plaintiffs claim that the Prudence Defendants violated their duty of prudence as named fiduciaries[4] or de facto fiduciaries[5] under ERISA, 29 U.S.C. §§ 1102(a)(1), 1002(21)(A), in their management of the Plans. *See* 29 U.S.C. § 1104(a)(1)(B) (stating that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and…(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims").[6] The plaintiffs allege that the Prudence Defendants failed to inquire appropriately into the merits of continued investment in Constellation stock, despite the company's risky business strategy, and continued to allow Plan participants to invest in Constellation stock. Specifically, the risky business practices cited by the plaintiffs include: (1) Constellation's increasing dependence on its energy trading business and subsequent overexposure to fluctuations in the energy market; (2) its acquisition of nearly seven billion dollars of risky and complex derivatives; and (3) its growing dependence on its own credit ratings and the

---

[4] ERISA defines a "named fiduciary" as "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2).

[5] The plaintiffs use the term "de facto fiduciaries" to describe those who are not named in the plan, but who fall within the statutory definition of "fiduciary." ERISA provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

[6] While subject to the general prudence requirement, Employee Stock Ownership Plans ("ESOPs") are exempt from the duty to diversify. *See* 29 U.S.C. § 1104(a)(2).

7

financial soundness of its trading counterparties. In addition, the plaintiffs cite the Prudence Defendants' continued placement of Constellation's matching contributions in Constellation stock as a violation of their duty of prudence.

The parties disagree over whether the defendants had the authority to divest the Plans of Constellation stock. The plaintiffs assert that the Plan documents gave the Prudence Defendants the discretion to divest. The Constellation Savings Plan provides: "Contributions to the Plan will be invested in *one or more* of the following Investment Funds under the Plan: (1) the CEG Common Stock Fund; (2) the Interest Income Fund; *or* (3) any Other Investment Fund(s) selected by the Investment Committee from time to time." (Mot. to Dismiss Ex. H at 16) (emphasis added). Although the Nine Mile Savings Plan states that "the Plan Administrator *may* direct that Matching Contributions will be invested in the Constellation Energy Group Stock Fund," (Mot. to Dismiss Ex. I at 47) (emphasis added), the Constellation Savings Plan requires the Administrator to invest employer matching funds in the CEG Stock Fund. (*See* Mot. to Dismiss Ex. J at 9.) The plaintiffs also argue that even if the Plan documents do not authorize divestment, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), requires the defendants to disregard the Plan documents if abiding by them would be imprudent.[7]

The parties also dispute the relevant standard for evaluating the prudence of the defendants' conduct, should the court find they had the authority to divest. The defendants argue the court must presume the defendants acted prudently, following the Third Circuit's decision in *Moench v. Robertson*. *See* 62 F.3d 553, 571 (3d Cir. 1995) (holding that an "[Employee Stock Ownership Plan

---

[7] 29 U.S.C. § 1104(a)(1)(D) provides:
> Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

("ESOP")] fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision"); *see also Kirschbaum v. Reliant Energy*, 526 F.3d 243, 254 (5th Cir. 2008) (applying *Moench* presumption); *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008) (citing *Moench* in support of proposition that plaintiff must demonstrate unreasonableness of ERISA fiduciary); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) (adopting *Moench* presumption for decisions made by fiduciaries of ESOPs). The plaintiffs, however, contend that the Fourth Circuit has implicitly rejected *Moench* by analyzing plan fiduciaries' conduct under a more exacting standard in *DiFelice v. U.S. Airways, Inc*. *See* 497 F.3d 410, 420 (4th Cir. 2007) (requiring plan fiduciaries to engage in a "reasoned decisionmaking process," which entails an "obligation to use appropriate methods to investigate the merits of removing a plan option such as an employer stock fund").[8]

Whether the defendants had the authority to divest the Plan of Constellation stock and, if so, whether their failure to divest should be analyzed under a presumption of prudence need not be decided at this time, however, because the plaintiffs' claim fails in any event.[9] Assuming without deciding that the defendants had the discretion to divest of Constellation stock and that a standard more exacting than the *Moench* presumption applies, the plaintiffs have not adequately alleged that the defendants acted imprudently by retaining employees' investments in Constellation stock during the Class Period. Tellingly, at oral argument the plaintiffs were unable to identify a particular point in time when the duty to divest would have been triggered, although they appeared to suggest it could be as late as August 2008.[10] The plaintiffs, nevertheless, start the Class Period in January

---

[8] In *DiFelice* the parties agreed that the fiduciaries had the authority to discontinue offering any of the investment funds, including company stock; further, employer matching funds were *not* to be invested in the company fund. 497 F.3d at 414 & n.1.
[9] For the same reason, the court need not address the Prudence Defendants' contention that they are not fiduciaries.
[10] (Tr. at 45.)

2008, despite the lack of any alleged new circumstances arising in January that should have alarmed the defendants. While the plaintiffs allege that Constellation's risky business practices were cause for divestiture, Constellation had pursued those practices since 2001, with highly profitable results until August or September 2008.

A company's decision to adopt a riskier business model is not in itself a fiduciary decision governed by ERISA, nor does that decision automatically trigger a duty to divest. *See e.g., Kirschbaum*, 526 F.3d at 248, 256 (finding no duty to divest where the company had transformed from a "traditional power utility company into a speculative energy trading operation" which "changed [company] stock from a classic long term conservative investment to a risky and volatile one") (internal quotation marks omitted); *In re Huntington Bancshares, Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 849-50 (D. Ohio 2009) (holding that the employer-company's decision to acquire a company that was overexposed to the subprime market was a general business decision not governed by ERISA's fiduciary standards). One cannot simply find investment in high-risk companies prudent when they succeed and imprudent when they fail. *See Kirschbaum*, 526 F.3d at 253 (noting that "the test of prudence is one of conduct, not results").

The plaintiffs also allege the defendants participated in a scheme to inflate the price of Constellation stock, consisting of optimistic messages to the public regarding the company's financial state and the calculation error in the Form 10-Q for the period ending March 31, 2008. Yet optimistic statements regarding future earnings are generally not actionable, as they do not have a material effect on share price. Several courts have noted the lack of materiality in the context of securities litigation. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (explaining that "expressions of puffery and corporate optimism do not give rise to securities violations"); *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (holding that

"generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial"); *Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir. 1997) (noting that "[a] reasonable purchaser would know that … statements [regarding future profits] consisted of optimistic predictions of future potential and would not have been misled by them"); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (finding that a company's predictions of future growth in its annual report, despite evidence of a contract slowdown, were not actionable because "'soft,' 'puffing' statements such as these generally lack materiality because the market price of a share is not inflated by vague statements predicting growth"). Therefore, Constellation's optimistic statements about its future earnings do not support a claim based on any alleged stock price inflation scheme.

In addition, although the calculation error underestimated Constellation's collateral obligations in the event of a two or three-level downgrade, it actually overestimated its obligations in the event of a one-level downgrade. The defendants argue, and the plaintiffs do not contest, that a one-level downgrade was the most probable scenario of the three. (*See also* Compl. ¶ 145 (quoting newspaper article stating that analysts believed a three-level credit downgrade, to "below investment grade," was unlikely).) Therefore, it seems implausible that this calculation error was part of an intentional scheme to inflate Constellation's stock price, as it overstated the company's collateral needs in the most likely of the three credit downgrade scenarios. In addition, Constellation corrected the error in its very next quarterly report, which it released soon after discovering the error at the end of July 2008.

Furthermore, the fact that the stock price declined throughout 2008 does not in and of itself trigger a duty to divest. The plaintiffs allege a 74 percent decline in stock value from the start of the Class Period in January 2008. Yet, as previously discussed, January 2008 is an arbitrary start date

for the Class Period, seemingly chosen because of the high stock price during that month. Overall, the stock price declined gradually from January 2008 until the Lehman Brothers bankruptcy in September 2008, which precipitated a much sharper drop. The share price declined by only 28.6 percent from January 2008, when it closed at $92.40 per share, to the end of August 2008, when it dropped to $66 per share, despite Constellation's disclosure of its calculation error in mid-August and the resulting one-level credit downgrade. Furthermore, by the end of June 2008, the stock price had already declined to $78 per share. This type of gradual decline does not raise a red flag that would trigger a duty to divest. *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1096, 1099 (9th Cir. 2004) (affirming dismissal of plaintiffs' prudence claim despite a 75 percent decline in stock value following a merger); *Kuper*, 66 F.3d at 1451, 1459-60 (finding that plaintiffs had not acted imprudently by failing to divest employee savings plan of company stock despite 80 percent drop in stock price).

The only steep decline in Constellation's stock price occurred after the Lehman Brothers bankruptcy on September 15, 2008, when the price of Constellation shares dropped by nearly 63 percent from $66 per share on August 31, 2008 to $24.77 per share on September 17, 2008. Yet the plaintiffs do not allege the defendants should have expected Lehman Brothers to collapse. Therefore, one cannot expect the defendants to have had the foresight to predict the Lehman Brothers bankruptcy and divest the Plan of Constellation stock beforehand. And, once the bankruptcy was announced, it would have been imprudent for the defendants to divest immediately, when Constellation stock was at its lowest price.

The plaintiffs then point to Constellation's merger agreement with MidAmerican following the Lehman Brothers bankruptcy to demonstrate that the company's poor financial health, as evidenced by the terms of the merger agreement, should have led the defendants to divest. The

12

defendants, however, note that this merger offer was a step towards Constellation's financial recovery, as it would have offered the company much needed collateral. Again, it would have been at least arguably imprudent for the Plan fiduciaries to sell off participants' shares of Constellation at a low price, knowing that the stock price might rise again in response to a successful merger. *See Kirschbaum*, 526 F.3d at 256 (noting that if the court were to require a fiduciary to predict the company's future stock price performance, "he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded"); *Moench*, 62 F.3d at 572 (observing that "if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive"). Accordingly, the plaintiffs have failed to state a claim for violation of the duty of prudence.

II. <u>Duty of Loyalty</u>

Count I of the complaint also includes a claim for breach of the duty of loyalty, based upon the defendants' alleged failure to disclose material adverse information in its communications to Plan participants. In *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 379-80 (4th Cir. 2001), the Fourth Circuit set out the broad scope of the duty of loyalty for ERISA fiduciaries. The court explained that the duty of loyalty "precludes a fiduciary from making material misrepresentations to the beneficiary," which includes refraining from intentionally misleading a beneficiary and not misinforming "employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *Griggs*, 237 F.3d at 380.

Constellation's Securities and Exchange Commission ("SEC") filings are incorporated into the Plan documents by reference. (*See* Def.'s Mot. to Dismiss Ex. J at 26, Ex. K at 28.) Therefore,

13

any misleading or false statements the defendants made in these documents would constitute misleading or false communications to Plan participants, in violation of the duty of loyalty. *See In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003) (noting that "[t]hose who are ERISA fiduciaries ... cannot in violation of their fiduciary obligations disseminate false information to plan participants, including false information contained in SEC filings").

The plaintiffs, however, have failed to allege sufficient facts to support a finding that the defendants' communications to Plan participants contained material misrepresentations. The crux of the plaintiffs' argument is that Constellation's public disclosures presented an overly optimistic outlook despite the company's risky business practices. Yet Constellation disclosed in its 2007 Annual Report that it was "exposed to various risks, including, but not limited to, energy commodity price and volatility risk, credit risk, interest rate risk, equity price risk, foreign exchange risk, and operations risk." (Pls.' Comp. ¶ 125 (quoting 2007 Annual Report).) In addition, in its 2006 Form 10-K, released on February 27, 2007, Constellation informed investors that:

> We purchase and sell power and fuel in markets exposed to significant risks, including price volatility for electricity and fuel and the credit risks of counterparties with which we enter into trades. … The inability or failure to effectively hedge assets or fuel or power positions against changes in commodity prices, interest rates, counterparty credit risk or other risk measures could significantly impair future financial results.

(Def.'s Mot. to Dismiss Ex. A-3 at 18.)[11] On the topic of credit ratings, Constellation disclosed that

---

[11] The court may consider Constellation's reports mandated by the SEC on this motion to dismiss because the plaintiffs have incorporated them by reference into their complaint. (*See* Compl. ¶ 241 (charging the defendants with providing Plan participants with inaccurate information concerning Constellation's financial outlook) and ¶ 207 (describing Constellation's SEC filings, annual reports, and press releases as communications with Plan participants that were incorporated by reference into the Plan documents)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference").

> A downgrade in our credit ratings could negatively affect our ability to access capital and/or operate our wholesale and retail competitive supply businesses. … If any of our credit ratings were to be downgraded, especially below investment grade, our ability to raise capital on favorable terms, including the commercial paper markets, could be hindered, and our borrowing costs would increase. Additionally, the business prospects of our wholesale and retail competitive supply businesses, which in many cases rely on the creditworthiness of Constellation Energy, would be negatively impacted.

(Def.'s Mot. to Dismiss Ex. A-4 at 21-22.)

In this sense, the present case is similar to *Huntington Bancshares*, in which the district court dismissed the plaintiffs' duty of loyalty claim after determining that the company had sufficiently disclosed its exposure to risk in the subprime, housing, and construction markets. *See* 620 F. Supp. 2d at 854-56. The court explained that the plaintiffs could not "satisfy their pleading burden by ignoring the content of the disclosures and conclusorily asserting that they were incomplete." *Id.* at 856. Instead, the court required the plaintiffs to "identify the additional information they claim was required to be disclosed and provide a basis for that assertion." *Id.*

Similarly, the plaintiffs in the present case gloss over the content of Constellation's numerous risk disclosures and fail to allege what specific information the defendants should have disclosed further. The plaintiffs simply describe the information Constellation provided as "inaccurate" and allege that the disclosures omitted "negative material information." (Compl. ¶ 241.) These conclusory allegations are insufficient to state a claim for relief. *See Twombly*, 550 U.S. at 555. Furthermore, although the calculation error in the Form 10-Q for the quarterly period ending March 31, 2008 constituted inaccurate information, Constellation corrected the error soon after it was discovered in the following 10-Q. Finally, as discussed above, Constellation's optimistic predictions of future earnings do not constitute material misrepresentations as a reasonable investor

15

would not rely on these statements when assessing the value of the company's stock. Therefore, the plaintiffs' duty of loyalty claim will be dismissed.

   III. Derivative Claims

The plaintiffs' remaining claims are for failure to monitor (Count II), breach of the duty to avoid conflicts of interest (Count III), co-fiduciary liability (Count IV), and knowing participation in a breach of fiduciary duty by a non-fiduciary (Count V). These claims all depend on a finding that the defendants breached the underlying duties of prudence and loyalty. *See e.g.*, *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003) (concluding that claims for failure to avoid conflicts of interest and failure to monitor fiduciaries "do not provide independent grounds for relief, but rather depend upon the establishment of an underlying breach of fiduciary duty cognizable under ERISA"). As the plaintiffs' prudence and loyalty claims fail, the remaining derivative claims also must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the defendants' motion to dismiss will be granted. A separate Order follows.


August  13, 2010                                  /s/
Date                                         Catherine C. Blake
                                             United States District Judge

16